# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>23431 Blue Bird Drive,<br>Lake Forest, California 92630 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 2:20-MJ-00490

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

> *See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

> *See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1084 | Transmission of Wagering Information |
| 18 U.S.C. § 1955 | Operation of an Illegal Gambling Business |
| 18 U.S.C. § 1956(a)(2) | Internationally Laundering the Proceeds of an Illegal Gambling Business |

The application is based on these facts:

> *See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael Impastato, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state:  Los Angeles, CA

Hon. Steve Kim, U.S. Magistrate Judge
*Printed name and title*

AUSA: J. Mitchell x0698

**AFFIDAVIT**

I, Michael Impastato, being duly sworn, depose and state:

I.   **INTRODUCTION**

1.    I am a Special Agent ("SA") with the Department of
Homeland Security - Immigration and Customs Enforcement –
Homeland Security Investigations ("HSI"), a federal agency
having responsibility for the investigation of the offenses as
to which the application is made.  I have been employed with HSI
since January 2004.  Shortly after beginning with HSI, I
attended the HSI SA Training Program at the Federal Law
Enforcement Training Center, where I received formal training in
various aspects of conducting financial, immigration, drug
trafficking, and gang investigations.  I have conducted numerous
criminal investigations and executed arrest and search warrants
for violations of federal and state laws.  I have training and
experience in interview techniques, arrest procedures, search
and seizure, search and arrest warrant applications,
investigations of various crimes, and physical and electronic
surveillance techniques.  Prior to joining HSI, I was an
Inspector with the U.S. Customs Service beginning in June of
2000, and, when the Department of Homeland Security was created
in March of 2003 merging Immigration and Customs Inspections
functions into CBP, I became a Customs and Border Protection
("CBP") Officer.  Currently, I am assigned to the High Intensity

1

Financial Crimes Area Task Force at the HSI Los Angeles Field Office in Long Beach, California ("HSI LA"), where I have been assigned since June of 2014.  While at HSI LA, I have participated in the execution of arrest and search warrants involving trade fraud, drug trafficking, and money laundering.

2.    I am familiar with the facts and circumstances described herein.  This affidavit is based upon my personal involvement in this investigation, my training and experience, and information obtained from various law enforcement personnel and witnesses, including information that has been reported to me either directly or indirectly, but does not purport to set forth my complete knowledge or understanding of the facts related to this investigation.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.  All figures, times, and calculations set forth herein are approximate.

## II.  PURPOSE OF AFFIDAVIT

3.    This affidavit is submitted in support of warrants to search property, described below and in greater detail in Attachment A, incorporated herein by reference, for evidence related to the following violations:

        a.    Transmission of wagering information, in violation of 18 U.S.C. § 1084;

2

   b. Operation of an illegal gambling business, in violation of 18 U.S.C. § 1955;[1] and

   c. Internationally laundering the proceeds of an illegal gambling business, in violation 18 U.S.C. § 1956(a)(2) (collectively, the "Subject Offenses").

## III. THE SUBJECT PREMISES TO BE SEARCHED

  4. This affidavit seeks authorization to search the SUBJECT PREMISES, located at 23431 Blue Bird Drive, Lake Forest, California 92630, described in detail in Attachment A.  The SUBJECT PREMISES is believed to be the residence of target EDON KAGASOFF ("KAGASOFF").[2]

## IV. SUMMARY OF PROBABLE CAUSE

  5. In 2017, HSI LA and the Internal Revenue Service – Criminal Investigation Division ("IRS-CID") began investigating an online sports gambling website, www.sandislandsports.com (the "Subject Website"),[3] and associated targets in Southern California.  The Subject Website operates as a sports book where

---

[1]  Section 1955 prohibits gambling businesses that violate the state law where such businesses are conducted.  California Penal Code 337a prohibits bookmaking and wagering bets based on "contest . . . of skill, speed or power of endurance of person or animal . . ."

[2] KAGASOFF is believed to share the SUBJECT PREMISES with his wife, Ashley Kagasoff, who is an attorney, licensed to practice law in California.

[3] An HSI trained Intelligence Research Specialist, using a domain registry search, determined that the Subject Website was created on June 4, 2008, and is registered in Costa Rica.

patron bettors can place bets on a variety of sporting events. The investigation revealed that MATTHEW FUNKE ("FUNKE"), WAYNE NIX ("NIX"), and KAGASOFF use the Subject Website to facilitate their own unlawful sports gambling organization in the Los Angeles area.

6.    While FUNKE, NIX, and KAGASOFF do not appear to have an ownership interest in the Subject Website, they have the ability to grant their patron bettors access to the Subject Website by issuing the patron a username and password.  After giving the patron access to the website, FUNKE, NIX, and KAGASOFF will set the bettor's credit line or limit through the Subject Website.  When a patron is ready to place a bet on a sporting event, the patron will log into the Subject Website with his username and password, and place a bet on a sporting event.  FUNKE, NIX, and KAGASOFF will then collect gambling losses, and pay winnings, to patrons in the Los Angeles area.

7.    The SUBJECT PREMISES is believed to be the residence of KAGASOFF.  DMV records indicate that KAGASOFF's home address is the SUBJECT PREMISES, and law enforcement has seen KAGASOFF enter and exit SUBJECT PREMISES on multiple occasions during surveillance, and as recently as January 27, 2020.  I have also reviewed subscriber records from Cox Communications dated December 24, 2018, that indicate that "Edon Kagasoff" subscribes to high-speed internet services at the SUBJECT PREMISES.

## V.   **STATEMENT OF PROBABLE CAUSE**

### A. BACKGROUND OF THE INVESTIGATION

8.   In September 2017, two patron bettors, herein identified as Confidential Informant One ("CI-1"),[4] and Confidential Informant Two ("CI-2"),[5] agreed to cooperate with law enforcement.  I have met numerous times with CI-1 and CI-2 and have read reports of additional debriefs that I did not attend.  According to CI-2, in order to access the Subject Website, FUNKE, or another individual associated with the Subject Website, must first provide a player with a user name and password.[6]  Once a player gains access to the Subject Website, bets are made against the line of credit the player was

---

4  In late 2017, IRS-CID and HSI LA first interviewed CI-1, who provided information about FUNKE and other subjects.  Law enforcement officers were able to corroborate information CI-1 provided through other investigative means, thus the information provided was considered reliable.  CI-1 does not have any criminal convictions, and has not received any payments from HSI or IRS-CID.  However, during his/her interview with IRS-CID, CI-1 expressed an interest in applying for an IRS award program that provides monetary rewards to tipsters if their information leads to a conviction.  CI-1 also stated he/she was willing to cooperate with law enforcement on this investigation to avoid paying a gambling debt of approximately $6 million he/she owes to FUNKE and his associates.
5 CI-2 was convicted in 2006 for Driving Under the Influence of Alcohol.  A records check of law enforcement databases indicates that CI-2 was encountered by CBP in 2005, and was searched at the U.S. border, at which time a revolver and 50 rounds of ammunition were discovered.  CI-2 was assessed a $210.00 penalty, and the items were seized.  CI-2 has not received any payments from HSI or IRS-CID.
6 I attempted to access the Subject Website but observed that it was accessible only with a username and password.

granted on the site.  According to CI-2, certain individuals associated with the Subject Website are able to raise a player's credit limit to allow for higher bets to be placed. Additionally, CI-2 indicated that players are able to call FUNKE and other individuals associated with the Subject Website to place bets directly through that individual.  Following a player's betting activity on the Subject Website, certain individuals associated with the Subject Website, such as FUNKE and his associates, will meet with the players in the Los Angeles area to collect gambling losses or to pay out gambling winnings.

9.   In 2017, law enforcement officers interviewed CI-1, who indicated that he/she was a player/client of the Subject Website and FUNKE.  During the interview, CI-1 indicated the following:

a.   CI-1 first met FUNKE in approximately 2010 when CI-1 was placing sports wagers through another sports betting website.  Between 2012 and 2013, CI-1 placed bets with FUNKE and the Subject Website and paid gambling losses by delivering cash and checks to certain entities owned or controlled by FUNKE.  A review of the bank records of CI-1, FUNKE, and entities owned or controlled by FUNKE confirmed that CI-1 did in fact make payments to these accounts.

b.   In or about late 2013, CI-1 stopped gambling with FUNKE after CI-1 paid FUNKE approximately $5,000,000 in 2012, and $3,000,000 in 2013 as a result of gambling losses.

c.   In 2016, CI-1 decided to start gambling again, but CI-1 did not want to use his/her account with FUNKE.  CI-1 then began using another account at the Subject Website that belonged to CI-1's friend, CI-2, who CI-1 had previously introduced to FUNKE.

10.   Beginning on May 31, 2018, the Honorable George H. Wu, United States District Judge, authorized a series of wire and electronic interceptions of FUNKE, NIX, and KAGASOFF, and others, including the following telephone: 323-893-2222 ("Target Telephone 4"), a cellular telephone subscribed in the name of "Edon Yoshida KAGASOFF" at the SUBJECT PREMISES.

11.   The wire and electronic interceptions confirmed the information provided by CI-1 and CI-2, i.e., that FUNKE was involved in unlawful sports gambling.  In addition, the interceptions revealed that KAGASOFF worked with FUNKE and NIX to commit the Subject Offenses.

12.   For example, on January 12, 2019, KAGASOFF used Target Telephone 4 to send an SMS message to (818)XXX-6504, a number believed to be used by a patron bettor.  During this message, KAGASOFF stated "Mobile Sandislandsports.com/m Standard site Sandislandsports.com RC3133 Password: Peter Credit 25k Max per

game 5k Half's 2500 Customer service/ call in plays 18004290395." Based on my training, experience, and knowledge of this investigation, I believe that KAGASOFF was providing the patron bettor with the information the bettor needed to access the Subject Website and the betting parameters for placing bets on the Subject Website.

13.   On January 15, 2019, KAGASOFF used Target Telephone 4 to receive an SMS message from (702)XXX-3328, a phone believed to be used by an associate who helps KAGASOFF commit the Subject Offenses. During this message, the associate said that he has "a guy in LA [who] wants to give a $15k deposit and start betting . . . ."

14.   Later that same day, KAGASOFF used Target Telephone 4 to receive a call from (213)XXX-9786, a phone believed to be used by a patron bettor. During this call, KAGASOFF asked the bettor which sports the bettor typically bets. The bettor responded, "just everything . . . NCAA basketball . . . football . . . hockey. . . ." Later that day, the bettor asked KAGASOFF, "will it be available as soon as I gave it to you cause I want to play . . . 3:30 and 4:00pm ones."

15.   In addition to communicating with patron bettors, KAGASOFF used Target Telephone 4 to discuss delivering money to NIX. For example, on November 14, 2018, KAGASOFF told NIX, "I gotta go drop the checks off." Later in the conversation, NIX

suggested, "Why don't I swing by your house tomorrow . . . and
then, I can take all that . . . and drop the checks off . . . .
I need to be at your house at what time to pick up the cash?"
KAGASOFF replied, "I could drop the cash tonight."  NIX replied,
"Or, I'll come grab it from you . . . . Okay, call me when you
get back to the house and I'll come scoop it up from you."
Based on my training, experience, and knowledge of this
investigation, I believe that NIX was arranging to pick up
gambling proceeds from KAGASOFF at the SUBJECT PREMISES.

    16.  On November 26, 2018, in a series of intercepted text
messages over Target Telephone 4, FUNKE and KAGASOFF discussed
FUNKE sending a wire transfer to KAGASOFF for money that FUNKE
owed KAGASOFF.  Specifically, FUNKE said, "I'll handle and take
it off my balance 100k owed . . . .  So send me wire
instructions for Wayne [NIX].  He told me to ask you.  Sending a
chunk of that 100."  Later, KAGASOFF said, "Let me know how much
u r wiring 100k loan-5400-7907=86694 balance owed) Make up ra219
5400 Make up r2001 7906" and "Edon Global LLC Bank of America
Acct XXXX9519 Routing XXXX0035."  FUNKE replied, "Dropping 50"
and "Let u know when I send."  Based on my training, experience,
and knowledge of this investigation, I believe that FUNKE was
planning to send gambling proceeds to KAGASOFF's business
account via wire transfer, in an amount adjusted for losses by
gambling players designated as RA219 and R2001.  As of August

14, 2019, California Secretary of State records show that the registered address for "Edon Global LLC" is the SUBJECT PREMISES.  Because KAGASOFF's business account is registered to his residence (the SUBJECT PREMISES), I believe that KAGASOFF will receive and maintain bank and business records at the SUBJECT PREMISES.

17.  In a series of intercepted text messages over Target Telephone 4 between FUNKE and KAGASOFF on November 28 and November 30, 2018, KAGASOFF and FUNKE discussed FUNKE making a loan payment.  Specifically, on November 28, 2018, KAGASOFF asked FUNKE, "Can you write a cashier's check instead," and instructed FUNKE to make it payable to "Fairway Holdings," and to send it via overnight mail to "Edon Kagasoff 23431 Blue Bird Dr. Lake Forest CA 92630 [SUBJECT PREMISES]."

18.  On June 24, 2019, KAGASOFF used Target Telephone 4 to call the Subject Website at 1-800-429-5153.  During the call, KAGASOFF told an employee of the Subject Website that he "collected the 50,000" from bettor "R128," and asked for the bettor's outstanding balance.  The employee told KAGASOFF that "R128 . . . owes [KAGASOFF] a million bucks. Jesus!"

19.  On July 8, 2019, KAGASOFF used Target Telephone 4 to call the Subject Website at 1-800-429-5153.  During the call, KAGASOFF told an employee of the Subject Website that he "collected the full balance 18,999" from player "R3805."

B. <u>PRACTICES OF ILLEGAL BOOKMAKERS</u>

20.  Based upon my training, experience, and knowledge of this investigation, I know a large-scale illegal gambling operation requires the cooperation and association of numerous individuals within the organization, including gamblers.  As a result, "bookmakers" like NIX, FUNKE, and KAGASOFF will often possess documents that will identify other members of the organization and customers, such as records, receipts, notes, ledgers, tally sheets, and other papers regarding illegal gambling or reflecting the proceeds of illegal gambling.  Based on my training, experience, and knowledge of this investigation, I believe these records will be maintained in both paper and electronic form.

21.  Based upon my training, experience, and knowledge of this investigation, I also believe that bookmakers typically keep cash, checks, money orders, and money-counters in their residences.  In addition, bookmakers that use websites to facilitate their gambling operation will typically use computers and digital devices to check the status of bets, grant new customers access to the website, and keep electronic spreadsheets of their customers and transactional history.  I believe this is particularly true in this case, as many of the wagers are made digitally to the Subject Website.

22.   It has been my experience that co-conspirators will also retain names, addresses, email and telephone numbers of other co-conspirators involved in the organization much in the same way as a business will maintain those records.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

23.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That

evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

24.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

13

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

25.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's

14

fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress KAGASOFF's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of KAGASOFF's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

26.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

15

## VII. <u>CONCLUSION</u>

27.  Based on the foregoing, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1084 (transmission of wagering information); 18 U.S.C. § 1955 (operation of an illegal gambling business); and 18 U.S.C. § 1956(a)(2) (internationally laundering the proceeds of an illegal gambling business), as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT PREMISES, as further described above and in Attachment A of this affidavit.


_____

Michael Impastato
Special Agent, United States
Homeland Security Investigations


Subscribed and sworn to before
me this _____ day of February 2020.

_____

16

## ATTACHMENT "A"

The SUBJECT PREMISES is located at 23431 Blue Bird Drive, Lake Forest, California 92630.  This address is the second structure west from the corner of Quail Way and Blue Bird Drive on the north side of Blue Bird.  It is a gray, two-story residence with a brown shingle roof and a stone façade with a white garage door with black hinges and handles.  There is a white fence separating the front and back yard.  The numbers "23431" are stenciled on the curb and there is a black mailbox in front of the residence with the numbers "23431."  There is a small patio to the east of the garage which leads to brown front door facing Blue Bird Drive and there is a large window on the east side of the door.

**ATTACHMENT "B"**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1084 (transmission of wagering information); 18 U.S.C. § 1955 (operation of an illegal gambling business); and 18 U.S.C. § 1956(a)(2) (internationally laundering the proceeds of an illegal gambling business) (collectively, the "Subject Offenses"), namely:

a.   Records, documents, programs, applications, or materials, including electronic mail and electronic messages, that relate to the placement of gambling bets, claims for payment, customer lists, ledgers of wagers, and address books;

b.   Records, documents, programs, applications, or materials, including electronic mail and electronic messages, that relate to gambling, Sandislandsports.com, or associated entities or persons;

c.   Records, documents, programs, applications, or materials, including electronic mail and electronic messages, that consist of bank statements, deposit slips, withdrawal slips, checks, cashier's checks, money orders, and wire transfer records;

d.    Records, documents, programs, applications, or materials, including electronic mail and electronic messages, that relate to bank accounts, digit currency or cryptocurrency, and safety deposit boxes;

e.    Records, documents, programs, applications, or materials, including electronic mail and electronic messages, that relate to purchases made with proceeds from the Subject Offenses;

f.    Records, documents, programs, applications, or materials, including electronic mail and electronic messages, that relate to hiding assets or proceeds from the Subject Offenses;

g.    U.S. currency and U.S. currency equivalent greater than $2,000;

h.    Indicia of ownership, residency, or occupancy of the SUBJECT PREMISES and things described in this warrant including records, documents, programs, applications and materials that consist of utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, escrow documents, canceled envelopes, keys, and bank account records;

i.    Records, documents, programs, applications, or materials, including electronic mail and electronic messages,

19

that relate to storage facilities or units, building space, and post office boxes;

j.   Any digital device used to facilitate the above-listed violations and forensic copies thereof.

k.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.  passwords, encryption keys, and other access
devices that may be necessary to access the device;

vii.  applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

viii. records of or information about Internet
Protocol addresses used by the device;

ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart

21

phones; digital cameras; peripheral input/output devices, such

as keyboards, printers, scanners, plotters, monitors, and drives

intended for removable media; related communications devices,

such as modems, routers, cables, and connections; storage media,

such as hard disk drives, floppy disks, memory cards, optical

disks, and magnetic tapes used to store digital data (excluding

analog tapes such as VHS); and security devices.

## II.  SEARCH PROCEDURES FOR DIGITAL DEVICES AND POTENTIALLY PRIVILEGED INFORMATION

4.   The following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of any privileged attorney-client communications or work product:

Non-Digital Evidence

5.   Law enforcement personnel conducting the investigation ("the Investigation Team") may be present at the search, but may not search or review any item prior to it being given to them by the "Privilege Review Team" (previously designated individual(s) not participating in the investigation of the case).

6.   The Privilege Review Team will review documents to see whether or not the document appears to contain or refer to communications between an attorney, including Ashley Kagasoff, or to contain the work product of an attorney ("potentially privileged information").  Those documents not containing or referring to such communications or work product may be turned over to the Investigation Team for review.

7.    In consultation with a Privilege Review Team Assistant United States Attorney ("PRTAUSA"), if appropriate, the Privilege Review Team member will then review any document identified as appearing to contain potentially privileged information to confirm that it contains potentially privileged information.  If it does not, it may be returned to an Investigation Team member.  If a member of the Privilege Review Team confirms that a document contains potentially privileged information, then the member will review only as much of the document as is necessary to determine whether or not the document is within the scope of the warrant.  Those documents which contain potentially privileged information but are not within the scope of the warrant will be set aside and will not be subject to further review or seizure absent subsequent authorization.  Those documents which contain potentially privileged information and are within the scope of the warrant will be seized and sealed together in an enclosure, the outer portion of which will be marked as containing potentially privileged information.  The Privilege Review Team member will also make sure that the locations where the documents containing potentially privileged information were seized have been documented.

8.    The seized documents containing potentially privileged information will be delivered to the United States Attorney's Office for further review by a PRTAUSA.  If that review reveals that a document does not contain potentially privileged information, or that an exception to the privilege applies, the document may be returned to the Investigation Team.  If appropriate based on review of particular documents, the PRTAUSA may apply to the court for a finding with respect to the particular documents that no privilege, or an exception to the privilege, applies.

Digital Evidence

9.    The Privilege Review Team will search for digital devices capable of being used to facilitate the subject offenses or capable of containing data falling within the scope of the items to be seized.  The Privilege Review Team will then review the identified digital devices as set forth herein.  The Investigation Team will review only digital device data which has been released by the Privilege Review Team.

10.    The Privilege Review Team will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.

11.   The Privilege Review Team and the Investigation Team shall complete both stages of the search discussed herein as soon as is practicable but not to exceed 180 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 180-day period without obtaining an extension of time order from the Court.

12.   The Investigation Team will provide the Privilege Review Team with a list of "privilege key words" to search for on the digital devices, to include specific words like "Ashley Kagasoff" or email addresses, and generic words such as "privileged" and "work product."  The Privilege Review Team will conduct an initial review of the data on the digital devices using the privilege key words, and by using search protocols specifically chosen to identify documents or data containing potentially privileged information.  Documents or data that are identified by this initial review as not potentially privileged may be given to the Investigation Team.

13.   Documents or data that the initial review identifies as potentially privileged will be reviewed by a Privilege Review Team member to confirm that they contain potentially privileged information.  Documents or data that are determined by this review not to be potentially privileged may be given to the Investigation Team.  Documents or data that are determined by this review to be potentially privileged will be given to the United States Attorney's Office for further review by a PRTAUSA. Documents or data identified by the PRTAUSA after review as not potentially privileged may be given to the Investigation Team. If, after review, the PRTAUSA determines it to be appropriate, the PRTAUSA may apply to the court for a finding with respect to particular documents or data that no privilege, or an exception to the privilege, applies.  Documents or data that are the subject of such a finding may be given to the Investigation Team.  Documents or data identified by the PRTAUSA after review as privileged will be maintained under seal by the investigating agency without further review absent subsequent authorization.

14.  The Investigation Team will search only the documents and data that the Privilege Review Team provides to the Investigation Team at any step listed above in order to locate documents and data that are within the scope of the search warrant.  The Investigation Team does not have to wait until the entire privilege review is concluded to begin its review for documents and data within the scope of the search warrant.  The Privilege Review Team may also conduct the search for documents and data within the scope of the search warrant if that is more efficient.

15.  In performing the reviews, both the Privilege Review Team and the Investigation Team may:

a.  search for and attempt to recover deleted, "hidden," or encrypted data;

b.  use tools to exclude normal operating system files and standard third-party software that do not need to be searched; and

c.  use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

16.   If either the Privilege Review Team or the Investigation Team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, they shall immediately discontinue the search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

17.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

18.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

19.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

20.   The government may also retain a digital device if the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

21.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

22.   In order to search for data capable of being read or interpreted by a digital device, the Investigation Team is authorized to seize the following items:

        a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

        b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

        c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

23.   During the execution of this search warrant, law
enforcement is permitted to: (1) depress Edon KAGASOFF's thumb-
and/or fingers onto the fingerprint sensor of the device (only
when the device has such a sensor), and direct which specific
finger(s) and/or thumb(s) shall be depressed; and (2) hold the
device in front of KAGASOFF's face with his eyes open to
activate the facial-, iris-, or retina-recognition feature, in
order to gain access to the contents of any such device.   In
depressing a person's thumb or finger onto a device and in
holding a device in front of a person's face, law enforcement
may not use excessive force, as defined in Graham v. Connor, 490
U.S. 386 (1989); specifically, law enforcement may use no more
than objectively reasonable force in light of the facts and
circumstances confronting them.

24.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.